**FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| TIMOTHY J. MITTS, | : | |
| | : | |
| Petitioner, | : | Civil No. 11-6679 (RBK) |
| | : | |
| v. | : | |
| | : | |
| DONNA ZICKEFOOSE, | : | **O P I N I O N** |
| | : | |
| Respondent. | : | |

This matter comes before the Court upon Respondent's filing of her answer to the Petition, see Docket Entry No. 5,[1] and Petitioner's filing of his traverse. See Docket Entry No. 7. For the reasons detailed below, this Court will grant Petitioner a writ of habeas corpus, thus providing him with a remedy in the form of a superceding administrative hearing.

**I.   BACKGROUND**

   **A.   Factual Background**

   Petitioner is a federal inmate serving his 51-month sentence imposed by the United States District Court for the Western District of Kentucky;[2] he is currently housed at FCI Fort Dix

---

[1] The Court takes this opportunity to commend Respondent's careful examination of this factually- and legally-dense matter.

[2] "[Petitioner] worked as tax preparer in New York. . . . In general, [Petitioner] agreed to review the client's tax

("Fort Dix"), Fort Dix, New Jersey.  Prior to being housed at Fort Dix, he was housed in a number of federal correctional facilities, one of which was USP Hazelton ("Hazelton"), a facility located in West Virginia, where Petitioner was confined on September 9, 2010.  See Docket Entry No. 5-1, at 26.

Petitioner maintains that, on that date, while Petitioner was standing on line to Hazelton dining facility, another inmate (namely, Richard Walters, BOP Register # 39913-13) entered the line in front of Petitioner, and that entry resulted in an oral argument between Petitioner and Walters.  See Docket Entry No. 1, "Statement of Case" Section (Attachment to Petition).

There appears no dispute that, after this oral argument, Walters and Petitioner entered the dining facility area, and a scuffle took place between them.  That scuffle was witnessed by a prison officers, who prepared an incident report reading:

> On 9/9/2010 at 10:45 AM as I was walking threw [sic] the dinning [sic] room in Camp food service I saw two inmates Striking [sic] each other with closed fists middle of the dinning [sic] room.  The two inmates are [Petitioner] and . . . Walters . . . .  I stated to them to knock it off and to separate.  Inmates did

---

returns . . . in exchange for a share . . . of any refund he generated by filing amended returns.  Then, . . . he prepared a partnership tax return for a business supposedly owned by the client [and] claimed enough deductions on the partnership return to generate a net loss . . . .  [H]owever, . . . the partnerships never existed and did not have any expenses or losses. . . . [Petitioner's] defense was that he had a good-faith belief that the partnerships . . . did exist, at least for tax purposes. . . .  The jury rejected [Petitioner's] defenses, and convicted him." United States v. Mitts, 396 F. App'x 296, 298 (6th Cir. 2010).

> not comply.  I called the control center via my radio
> that I had a fight in food service.  I then gave the
> inmates more verbal commands to stop and the Inmates
> [sic] complied.  Staff arrived and escorted both
> inmates out of food service.

Docket Entry No. 5-1, at 26.

Right after the incident, Petitioner was given a copy of the above-quoted incident report, and another prison officer discussed the incident with him; during that discussion, Petitioner stated, "I did not throw a [single] punch." Id. at 44.  The incident report eventually resulted in a disciplinary hearing.  See id.  During that hearing, Petitioner made additional statements; specifically, he averred as follows:

> [Right after Walters cut into the line to the dining
> facility, Walters] made [a] statement [to Petitioner to
> the effect] that [Walters] should always be first in
> line.  [In response, Petitioner] told [Walters, "]like
> his sister[," implying that Walters] put himself before
> his sister because she got [sentenced to a] seventeen
> year [prison term, while Walters] only got five year
> [term of imprisonment.  Walters] got really angry and
> followed [Petitioner] to the salad bar [area], knocked
> over [Petitioner's] tray [and] then aggressively bumped
> [Petitioner] with his stomach.  Then [Walters] hit
> [Petitioner] with his fists. [Walters] is 6'5" and 240
> pounds. Petitioner [who is much smaller,[3]] just tried
> [his] best to cover up and duck under [Walters']
> punches.

Id. at 42.

---

[3] In his submissions to this Court, Petitioner points out that he is a 5'9," 180-pound Caucasian male, while Walters is an African-American.  Petitioner asserts that the difference in his and Walters' weight and height could be relevant to the question of danger Walters' attack exposed Petitioner.  While Petitioner's assertion to that effect is correct, Petitioner's reference to his and Walters' races is both inappropriate and irrelevant.

As a result of this disciplinary hearing, Petitioner was found guilty of committing a disciplinary infraction, namely, a prohibited act of "Fighting with Another Person," and so he was sanctioned to loss of 27 days of good-conduct-time ("GCT") credit, plus a period of disciplinary segregation and a temporary loss of certain prison-life privileged (such as having visitors, using telephone and making commissary purchases).  In entering the aforesaid decision to sanction Petitioner, the disciplinary officer assessed the above-quoted Petitioner's oral statement and incident report, as well as memoranda from other prison staff members (who, as their statements showed, did *not* witness the incident), as well as medical assessments of both Walters and Petitioner.[4]  The disciplinary officer stated that Petitioner was sanctioned in order to "hold Petitioner accountable" and to

---

[4] Respondent's exhibits indicate that one of the officers who executed these additional memoranda arrived to the dining facility after both Petitioner and Walters "were restrained" and merely observed that Petitioner's eyeglasses were broken; the other officer saw even less, i.e., only that Petitioner and Walters were "restrained"; the third officer also saw Petitioner and Walters "restrained" and, in addition, "numerous food service items on the floor." See Docket Entry No. 5-1.  Thus, the statement that "both inmates [were] striking each other" appeared solely in the incident report prepared by that single officer who saw the incident.  Medical examination of both Petitioner and Walters detected no physical injuries of either of these men, and both of them denied having any injuries. See id. at 33-37.  Therefore, the record indicates that the disciplinary officer effectively had only two relevant statements: (a) the incident report alleging that Walters and Petitioner were "striking each other"; and (b) Petitioner's statement averring that massive Walters was striking him, while smaller Petitioner was merely trying to cover himself up and duck under Walters' punches.

"deter . . . others" from misconduct.

Prior to his disciplinary hearing, Petitioner was informed of his rights: (1) to have a staff representative (who would assist Petitioner in his preparation for the hearing and would represent him during the hearing); and (2) to call witnesses. The parties' position as to these two issues are at odds.  As to the issue of calling witnesses, Respondent: (a) concedes that the disciplinary officer's report indicated that Petitioner requested witnesses (by having the relevant box in the form checked); but (b) suggests that this "check-mark" must have been a typo, since two other documents in the record indicated that Petitioner did not wish to call witnesses.  As to the issue of having Petitioner represented during and prior to the disciplinary hearing by a staff member, Respondent points out that the record contains Petitioner's formal waiver of that opportunity.[5]

---

[5] The waiver form provided by Respondent has inconsistent entries, in the sense that the box requesting representation is checked (with a tick-shaped "check-mark"), and the name of staff representative is entered ("Mr. Sines"), but that tick is scribbled on, and another box, stating that no staff representation is requested is checked, not with a tick but with a forward-slash. See Docket Entry No. 40.  The sole other box in the form is checked with a tick. See id.  Moreover, Petitioner maintains that he is in possession of a carbon copy of the original form, and his copy, indeed, shows that he did request staff representation (by placing the tick mark). See Docket Entry No. 7, at 13 and 41.  The Court notes its grave concern with this discrepancy in evidence.  While the Court has no reason to suspect Respondent (or Respondent's counsel, or the person who prepared the affidavit for Respondent) in any wrongdoing, the Court is left to wonder about the authenticity of record compiled by Hazelton prison officials.  Cf. Thornton v. Micrografx, 878 F.

Petitioner's traverse asserts that: (a) Petitioner wished to call numerous inmates as Petitioner's witness(es), but could not do so without staff representation; and (b) Petitioner's written waiver was falsified.[6]  See Docket Entry No. 7.

There is an analogous disagreement between the parties as to the issue of Petitioner's exhaustion of administrative remedies.[7] The record shows that Petitioner's appeal to the Regional Director was received out of time and, correspondingly, dismissed

---

Supp. 931, 938 (N.D. Tex. 1995) ("The court refuses to leave its common sense at the courthouse steps").

[6] Petitioner's traverse asserts that Petitioner was placed in solitary confinement right after the incident.  Petitioner maintains that, initially, he was threatened by prison officials with being held in solitary confinement indefinitely unless he waived his right to staff representation, and the "altered" waiver of staff representation was a document produced not by Petitioner but by an entity unknown to Petitioner and not acting as his agent.  Petitioner maintains that staff representation was an indispensable condition precedent to his ability to call witnesses, since Petitioner: (a) was aware that over forty inmates witnessed the scuffle, and so he believed that, if called to testify, these inmates would have corroborated his position; (b) learned that Walters confessed to Hazelton authorities that Petitioner's participation in the scuffle was limited to covering himself from Walters' punches; but (c) being held in solitary confinement without access to a staff representative, Petitioner was not in the position to either identify the inmates who were at the dining facility at the time of the scuffle or to contact Walters in order to verify the fact of Walters' confession.  See, generally, Docket Entry No. 7 (detailing the same at length).

[7] Respondent correctly points out that disciplinary sanction-based "appeals are only a two-step . . . process [with the first step being an appeal] to the Regional Director. See 28 C.F.R. § 542.15(d).  If the Regional Director denies the appeal, the inmate may appeal that decision to the BOP's General Counsel . . . .  See 28 C.F.R. § 542.15(a)."  Docket Entry No. 5, at 13.

as untimely, and his appeal of the same to the Central Office was, too, dismissed as out of time. See Docket Entry No. 5-1, at 18-21. Respondent concedes that Petitioner's exhaustion efforts might have been hampered by Petitioner's being in commute from one prison to another, and then another,[8] but observes that, even if Petitioner's time to seek administrative review could be equitably tolled by this period of commute, Petitioner's administrative applications were still untimely. Petitioner, however, maintains that his exhaustion efforts were additionally delayed by him being provided with an incorrect address of the Regional Office and by denial of administrative forms, see Docket Entry No. at 7, and, thus, his Petition at bar should qualify for excuse of exhaustion in light of his multiple good-faith efforts to comply with the exhaustion requirement.[9]

---

[8] It appears that, post-sanctions, Petitioner was moved to FCI Morgantown ("Morgantown"), located also in West Virginia. It also appears that, soon thereafter, Petitioner was transferred from Morgantown to his current place of confinement, Fort Dix, while Walters – whose release is anticipated in October 2012, was eventually transferred to a Community Correctional Center "Annapolis Junction," located in Baltimore, Maryland.

[9] Although 28 U.S.C. § 2241 contains no statutory exhaustion requirement, a federal prisoner ordinarily may not bring a petition for writ of habeas corpus under 28 U.S.C. § 2241, challenging the execution of his sentence, until he has exhausted all available administrative remedies. See, e.g., Callwood v. Enos, 230 F.3d 627, 634 (3d Cir. 2000); Bradshaw v. Carlson, 682 F.2d 1050, 1052 (3d Cir. 1981); Arias v. United States Parole Comm'n, 648 F.2d 196, 199 (3d Cir. 1981); Soyka v. Alldredge, 481 F.2d 303, 306 (3d Cir. 1973). The exhaustion doctrine promotes a number of goals: it is "(1) allowing the appropriate agency to develop a factual record and apply its

**B.     Procedural Background**

The Petition at bar raised a panoply of habeas and civil rights challenges. <u>See</u> Docket Entry No. 1.  Prior to ordering Respondent's answer, the Court screened the Petition <u>sua sponte</u> and dismissed his challenges asserting undue transfer from one facility to another, failure-to-protect claims and other claims for damages (based on loss of prison-life privileges or the prison officials' allegedly undue resort to "incorrect code"): all such dismissals were for lack of habeas jurisdiction, without prejudice to Petitioner's filing a civil complaint raising these challenges. <u>See</u> Docket Entry No. 3.  Petitioner's claim seeking expungement of his prison record was reserved, and Respondent was directed to answer solely Petitioner's claim asserting undue loss of GCT credit. <u>See</u> <u>id.</u>  Therefore, at this juncture, the Court resolves only the GCT credit issue.

---

expertise facilitates judicial review; (2) permitting agencies to grant the relief requested conserves judicial resources; and (3) providing agencies the opportunity to correct their own errors fosters administrative autonomy." <u>Goldberg v. Beeler</u>, 82 F. Supp. 2d 302, 309 (D.N.J. 1999), <u>aff'd</u>, 248 F.3d 1130 (3d Cir. 2000); <u>see also</u> <u>Moscato v. Federal Bureau of Prisons</u>, 98 F.3d 757, 761 (3d Cir. 1996).  Here, (1) Respondent's answer already produced all the currently-available record, (2) this Court's resources have already been invested in this matter, and (3) there appears to be no likelihood that the BOP would <u>sua sponte</u> correct its errors in handling Petitioner's disciplinary proceeding.  Reading these facts in conjunction with Petitioner's averment as to his good-faith exhaustion efforts (and his attachments to the traverse verifying the same), and taking notice of Petitioner's numerous attempts to obtain appellate administrative review, this Court finds it warranted to excuse Petitioner's failure to comply with the exhaustion requirement.

**II.  DISCUSSION**

Since this Court writes solely for the parties, a recital of the Court's jurisdiction and propriety of venue is unnecessary: it was already provided in Respondent's well-detailed answer.

**A.  Habeas Review and Habeas Remedy**

Analogously, the general legal framework of the issues at hand was correctly set forth in Respondent's answer.  Convicted and sentenced prisoners retain the protections of the Due Process Clause of the Fifth and Fourteenth Amendments that the government may not deprive them of life, liberty, or property without due process of law.  See Wolff v. McDonnell, 418 U.S. 539, 556 (1974); Haines v. Kerner, 404 U.S. 519 (1972); Wilwording v. Swenson, 404 U.S. 249 (1971).  Such protections are, however, "subject to restrictions imposed by the nature of the regime to which [prisoners] have been lawfully committed. . . .  In sum, there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application."  Wolff, 418 U.S. at 556.

A liberty interest protected by the Due Process Clause may arise from either of two sources: the Due Process Clause itself or from state or federal law.  See Hewitt v. Helms, 459 U.S. 460, 466 (1983); Asquith v. Department of Corrections, 186 F.3d 407, 409 (3d Cir. 1999).  Where the government has created a right to GCT credits, and has recognized that a prisoner's misconduct

authorizes deprivation of the right to GCT credits as a sanction,[10] "the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." Wolff, 418 U.S. at 557. Thus, a prisoner is: (a) entitled to an impartial disciplinary tribunal, see Wolff, 418 U.S. at 570-71; and (b) prison officials must also provide a prisoner facing disciplinary sanctions with (1) a written notice of the charges at least 24 hours prior to any hearing, (2) an opportunity to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals, and (3) a written statement by the factfinders as to the evidence relied upon and the reasons for a disciplinary sanction.[11] See id., at 564-66.

---

[10]   The Constitution itself does not guarantee GCT credits for satisfactory behavior in prison. Congress, however, has provided that federal prisoners serving a term of imprisonment for more than one year, other than a term of imprisonment for the duration of the prisoner's life, may receive credit toward the service of their sentence based upon their conduct. See 18 U.S.C. § 3624(b); 28 C.F.R. § 523.20.

[11] The Court takes this opportunity to point out both parties' joint confusion as to the issue of staff representation. While BOP regulations do, indeed, provide for an opportunity to have a staff representative, the constitutional safeguards are not that broad. Accord Wolff, 418 U.S. at 564-66 (listing only four protections that do not include staff representation). Therefore, a failure to provide a staff representative to an

The aforesaid constitutional safeguards could be defined as a "quasi-procedural" side of due process. On the "quasi-substantive" side, due process requires that findings of a prison disciplinary official be supported by "some evidence" in the record. See Superintendent, Massachusetts Correctional Institution at Wolpole v. Hill, 472 U.S. 445, 454-56 (1985); Young v. Kann, 926 F.2d 1396, 1402-03 (3d Cir. 1991).

---

inmate cannot, *in and by itself*, qualify as a constitutional violation. However, the issue of having a staff representative overlaps with a constitutionally protected right to call witnesses if an inmate is so unfortunately positioned that, without assistance of a staff representative, (s)he is prevented from having a meaningful opportunity to identify or call his/her witnesses. Also, bearing on the subject of the parties' confusion, the Court notes Petitioner's erroneous reliance on Brady v. Maryland. "[His] argument that he was denied disc[losure] in violation of Brady v. Maryland, 373 U.S. 83 (1963), . . . is misplaced. [Brady] involve[d] issues of constitutional rights afforded to *criminal defendants during their criminal trial* proceedings and [it is] not applicable to institutional disciplinary proceedings. In Wolff, the Supreme Court held that, while prisoners retain certain basic constitutional rights, including procedural due process protections, prison disciplinary hearings are not part of criminal prosecution . . . . [See Wolff, 418 U.S.] at 556-57; Young v. Kann, 926 F.2d 1396, 1399 (3d Cir. 1991)." Santiago v. Nash, 2006 U.S. Dist. LEXIS 67447, at *10 (D.N.J. Sept. 20, 2006) (emphasis supplied), aff'd 224 F. App'x 175 (3d Cir. 2007). The Court notes, with concern, Petitioner's reliance on Chavis v. Rowe, 643 F.2d 1281, 1285-86 (7th Cir. 1981), since the Third Circuit's case, which Petitioner cited in connection with Chavis, expressly stated that Chavis is not good law in this Circuit. See Albert-Diaz v. Scism, 2011 U.S. Dist. LEXIS 27081 (M.D. Pa. Jan. 20, 2011) (the case misrepresented in Petitioner's traverse to create an impression that Chavis was adopted by this Circuit). The Court, therefore, urges Petitioner to avoid trickery in all administrative and court proceedings, since such practice necessarily detracts from Petitioner's credibility and greatly injures, rather than fosters, his cause.

The Supreme Court guided:

> The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have *some basis* in fact. Revocation of good time credits is not comparable to a criminal conviction, and neither the amount of evidence necessary to support such a conviction, nor any other standard greater than some evidence applies in this context.

Hill, 472 U.S. at 456 (internal citations omitted, emphasis supplied).

Hence, the "some evidence" requirement is violated if a disciplinary sanction is rendered either (a) without any factual basis, or (b) on the basis of facts that are false.[12] Cf. Williams v. Federal Bureau of Prisons, 85 F. App'x 299, 303 (3d Cir. 2004) (noting, without endorsement, the holding of in Paine v. Baker, 595 F.2d 197, 201 (4th Cir.1979), that "[i]n certain limited circumstances a claim of constitutional magnitude is raised where a prisoner alleges (1) that information is in his file, (2) that the information is false, and (3) that it is relied upon [by an administrative body] to a constitutionally significant degree [and to the petitioner's detriment]").

If a federal court sitting in habeas review finds that the constitutional safeguards, be they on "quasi-procedural" or

---

[12] Such falsity is not limited to malicious falsification; it may ensue from a good faith error, bona fide confusion, negligent oversight, etc. of the person whose observations produced the false statement/testimony offered for considerations of the disciplinary officer presiding over an administrative hearing.

"quasi-substantive" side of due process, have been violated, the sole remedy that court could offer is a curative hearing.[13]

### B. Deficiency of Petitioner's Administrative Proceedings

As noted supra, Respondent's position is correct in terms of the legal standard asserted. However, Respondent "unduly compartmentalizes multiple due process requirements instead of reading these requirements jointly." Cannon, 2010 U.S. Dist. LEXIS 59468, at *18.

True, the requirement of due process is satisfied if "the findings of the prison disciplinary board [were] supported by some evidence in the record." Hill, 472 U.S. at 454-55; Young,

---

[13] "[I]f a federal court determines that an inmate's due process rights were violated during an administrative hearing, . . . the proper remedy is a curative administrative hearing conducted in accordance with due process requirements (only if the administrative body expressly fails to comply with a judicial order directing new and procedurally correct hearing, such failure gives basis to the court's further intervention, e.g., by means of holding an in-court hearing or directing the administrative body to correct the prison term of the affected inmate)." Cannon v. Schultz, 2010 U.S. Dist. LEXIS 59468, at *16-17 (D.N.J. June 16, 2010) (citing Mickens-Thomas v. Vaughn, 355 F.3d 294 (3d Cir. 2004); Toolasprashad v. Grondolsky, 570 F. Supp. 2d 610, 631 (D.N.J. 2008) ("The only remedy the court can give is to order the [administrative body] to correct the abuses or wrongful conduct within a fixed period of time") (quoting Billiterri v. United States Board of Parole, 541 F.2d 938, 943-44 (2d Cir. 1976), and citing Furnari v. United States Parole Comm'n, 531 F.3d 241 (3d Cir. 2008)); cf. Wilkinson v. Dotson, 544 U.S. 74 (2005) (pointing out that a procedurally proper curative administrative proceeding might yield a substantive determination identical to that reached as a result of a procedurally defective administrative proceeding); Howard v. United States Bureau of Prisons, 487 F.3d 808 (10th Cir. 2007) (remanding the case for further proceedings envisioning, inter alia, a curative administrative hearing)).

926 F.2d at 1402-03. But the test articulated in Hill and Young is not divorced from the holding of Wolff, 418 U.S. at 570-71, which mandates the prison officials to provide the inmate with a meaningful opportunity to call witnesses. See Cannon, 2010 U.S. Dist. LEXIS 59468, at *20 ("[H]aving these tests read jointly, a finding that an administrative sanction was supported by 'some evidence' cannot be made without a determination that the sanctioning hearing officer duly credited these such evidence with reliability *upon being provided with testimonies of the pertinent witnesses presented by the inmate*") (emphasis supplied).

Therefore, while the disciplinary officer presiding over Petitioner's administrative hearing could find the statement in the incident report more credible than Petitioner's testimony,[14] a

---

[14] The Court is troubled by an outright oddity of the disciplinary report produced as a result of Petitioner's disciplinary hearing. See Docket Entry No. 5-1, at 44-45. In executing that report, the disciplinary officer: (a) curiously construed the memoranda of other officers (who were dispatched to the dining area *after* the scuffle and noticed only that both Walters and Petitioner were "restrained," there was food on the floor, and that Petitioner's eyeglasses were broken), as well as Walters and Petitioner's medical reports (showing that neither one suffered an injury), as evidence of Petitioner throwing punches at Walters; and (b) recited the incident report of the sole officer who saw the scuffle (and who stated that both Walters and Petitioner were "striking each other") *six times*, masquerading each such recital as a reference to a different piece of evidence and accompanying each such recital with a peculiarly sophistic statement that the disciplinary officer "gives greater credibility to the [incident report simply because] staff are bound by law and their professional code of conduct to provide incident reports that are accurate and

prerequisite to such finding had to be the disciplinary officer's good-faith conclusion that the incident report was correct in its assertion that Petitioner and Walters were "striking each other."  In other words, the disciplinary officer presiding over Petitioner's administrative proceeding was not in position to intelligently assess the credibility of the incident report against Petitioner unless that disciplinary officer was also exposed to the testimony of witnesses whom Petitioner could offer (since, upon reflecting on such witnesses' statements, the disciplinary officer was, indeed, fully authorized to conclude that the incident report was not credible and reflected an error, perhaps a good-faith error, in the observations made by the officer who had executed the incident report).

Respondent's answer, while thoughtful in all other respects, failed to take notice of this important, although admittedly

---

truthful").  Taken to its logical conclusion, the disciplinary report suggests a troubling rule that an error by a staff member (resulting, for instance, from the staff member's good faith confusion or oversight) has to be elevated to the status of truth and, also, must trump all other evidence, thus transforming the disciplinary hearing into a mechanical act of rubber-stamping the error.  Such rule flies in the face of Hill, Young and Wolff. See Helms v. Hewitt, 655 F.2d 487 (3d Cir. 1981) (defining, as "unacceptable," a hearing officer's blind reliance on an investigating officer's summary), rev'd on other grounds, 459 U.S. 460 (1983); see also Young v. Kann, 926 F.2d 1396, 1402 (3d Cir. 1991) (wisely "warning against dependence upon a prison official's account without 'any form of corroborative evidence'" and citing Hensley v. Wilson, 850 F.2d 269, 276-77 (6th Cir. 1988) (the disciplinary body failed to satisfy due process by blindly accepting an investigatory officer's version)).

subtle point.  That oversight, in turn, prevented Respondent from realizing that Petitioner might have been sanctioned on the basis of "some evidence" (i.e., the incident report), which the disciplinary officer could have very well found unreliable or untrue (and such finding would necessarily have transformed this "some evidence" into no evidence at all).  Cf. Paine 595 F.2d at 201 (observing that "[o]ur concern is where the administrators rely [to a constitutionally significant degree] on information which is false," and citing Meachum v. Fano, 427 U.S. 215, 228-29 (1976)); accord Young, 926 F.2d at 1402; Helms, 655 F.2d 487.

Consequently, denial of a meaningful opportunity to call witnesses could be irrelevant to Petitioner's challenges in one, and only one scenario: if such witnesses could not have shed any light on the issue of whether Petitioner was actually fighting with Walters or was simply being beaten by Walters.[15]

---

[15] For the purposes of the case at bar, this Court need not reach the issue of what is and is not a proper interpretation of the word "fighting."  However, taking notice of the definition provided by Merriam-Webster dictionary, see <<http://www.merriam-webster.com/dictionary/fight>> (defining the verb "fight" as an act during which one "strive[s] to overcome a[nother] person by blows," the Court notes that it would be wholly anomalous to equate the term "fighting" with the act of protecting oneself from another person's blows.  Indeed, while an exchange of blows, even if one of the participants believes that (s)he is inflicting punches in self-defense, could be qualified as "fighting," the acts of covering one's head or shielding one's body, or ducking punches, cannot qualify as "fighting": these acts can qualify only as not turning oneself into a punch bag.  Had it been otherwise, law-obedient inmates – driven by sheer fear of sanctions – would have to passively lend themselves to physical violence of disobedient prisoners.  Thus, BOP regulations (duly

Here, the relevant part of record suggests that witness testimony could have been exceedingly helpful to the disciplinary officer, but Petitioner was deprived of a meaningful opportunity to call witnesses since it appears that: (a) he was not the person who executed the written waiver of staff representation; (b) he might have been coerced into making an oral waiver; and (c) being placed in solitary confinement, Petitioner found himself in a dire situation where, without assistance of a staff representative, he was unable to either detect the identities of the inmates present in Hazelton dining facility on September 9, 2010, at 10:45 a.m. or to determine whether Walters confessed to Petitioner being merely the victim of Walters' violence.  Cf. Alston v. Parker, 363 F.3d 229, 233 n.6 (3d Cir. 2004) ("[The litigant] may be unaware of the identities . . . of relevant actors"); Singletary v. Pa. Dep't of Corr., 266 F.3d 186, 190 (3d Cir. 2001) (suggesting that a person subjected to excessive force is, typically, busy with trying to protect himself/herself from that forth and, thus, is often unable to take note of the identities of relevant witnesses).  Therefore, the Court finds that grant of a writ of habeas corpus is warranted under the unique, rather unfortunate, circumstances of this matter and will

---

prohibiting fights between inmates and imposing high category sanctions upon the violators) cannot be read as licensing prison officials to sanction victims of violence simply on the ground that the victims were protecting themselves by covering up.

direct the BOP to provide Petitioner with a curative hearing.[16]

## III. CONCLUSION

Based on the foregoing, the Court will grant Petitioner a writ of habeas corpus allowing for a curative administrative hearing, where Petitioner would be availed of a meaningful opportunity to present witness testimony.

The issue of expungement of Petitioner's prison record will

---

[16] The Court is mindful that its decision to direct a curative hearing a year and a half after the underlying events took place poses a formidable task for Respondent in light of Petitioner's current housing at Fort Dix, the records being held in West Virginia (either in Hazelton or in Morgantown), the prison officer who executed the incident report being employed in West Virginia (seemingly, at Hazelton), inmates present in Hazelton dining facility on September 9, 2010, at 10:45 a.m. either released or scattered through prisons all over the country, and Walters being confined in Maryland.  The Court, therefore, will allow Respondent ample time to conduct a curative hearing by means Respondent finds most suitable, provided that such hearing is conducted in good faith and with the best means *reasonably* available to Respondent.  Accord Cannon, 2010 U.S. Dist. LEXIS 59468, at *26-27, n. 6 (outlining Respondent's options and the leeway allowed to Respondent in circumstances analogous to those at bar).  The Court offers Respondent its *non-binding* recommendation to examine the file of Walters' disciplinary hearing and suggests, also in a *non-binding* fashion, that Petitioner's appointed staff representative (that is, if Petitioner requests such representative for the purposes of his curative hearing) would focus on determining whether Walters could be called as Petitioner's witness.  In that vein, the Court notes that Petitioner is expected to cooperate, in good-faith, with Respondent's efforts arranging for a curative hearing: Petitioner shall not construe the issuance of a writ as an invitation for unreasonable and/or frivolous demands.  In the event Respondent determines that she faces an insurmountable task or a task that cannot be performed without undue financial or personal hardship or for legitimate safety concerns.  Respondent shall promptly notify the Court of such developments, together with any recommendations as to how to proceed.

remain reserved.[17]

    An appropriate Order accompanies this Opinion.

s/Robert B. Kugler
**ROBERT B. KUGLER**
**United States District Judge**

Dated: April 20, 2012

---

[17] It is self-evident that, in the event the curative administrative hearing results in a finding that Petitioner had committed a disciplinary infringement of "Fighting with Another", Petitioner's prison record would require no correction or expungement.  In the event Petitioner's curative administrative hearing results in another finding, this Court will revisit the issue of whether such new finding could give rise to an expungement challenge cognizable in a habeas action under the cautious language employed in Williams, 85 F. App'x at 303, as read in light of Wilkinson v. Dotson, 544 U.S. 74 (2005).